No. 2017-6394

In the

# United States Court of Appeals

## for the Sixth Circuit

FENDER MUSICAL INSTRUMENTS CORPORATION,

*Plaintiff-Appellee,*

v.

KELTON SWADE, individually and doing business as Kelton
Swade Guitars; KELTON SWADE, LLC,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville, Case No. 3:13-cv-01075.
The Honorable Waverly D. Crenshaw, Judge Presiding.

## APPELLEE'S BRIEF

Theodore H. Davis Jr.
Crystal C. Genteman
KILPATRICK, TOWNSEND & STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
Telephone: (404) 815-6500

*Counsel for Plaintiff-Appellee Fender
Musical Instruments Corporation*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 17-6394                    Case Name: Fender v. Swade

Name of counsel: Theodore H. Davis Jr.


Pursuant to 6th Cir. R. 26.1, Fender Musical Instruments Corporation
                              *Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No.

CERTIFICATE OF SERVICE

I certify that on June 27, 2018June 27, 2018, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

/s/ Theodore H. Davis Jr.

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form .

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT ...............................................1

STATEMENT OF JURISDICTION..................................................................1

STATEMENT OF ISSUES ...........................................................................2

STATEMENT OF THE CASE........................................................................3

    A.    Swade's Counterfeiting and Infringement of Fender's Registered Trademarks..........................................................................3

    B.    Swade's Agreement to Stop Using Guitar Headstocks "in any Way Similar" to those of Fender and his Consent to Injunctive Relief Memorializing That Standard...................................................5

    C.    Swade's Violation of the Settlement Agreement and Permanent Injunction..................................................................................8

    D.    The District Court's Consideration of the Contempt Motion and the Failure of Swade's Counsel to Familiarize Himself With Fender's Moving Papers.................................................................9

    E.    The Parties' Post-Contempt Order Motion Practice and Swade's Failure to Notice a Timely Appeal of the Contempt Order ...............19

SUMMARY OF ARGUMENT .......................................................................22

ARGUMENT ...........................................................................................25

I.      STANDARDS OF REVIEW .................................................................25

II.     THIS COURT SHOULD REJECT SWADE'S CHALLENGES TO THE APRIL 7, 2017, CONTEMPT ORDER.............................................25

    A.    No Appellate Jurisdiction Exists Over the Contempt Order..............25

    B.    Swade Has Waived the Challenges to the Contempt Order in Sections III-V of his Brief.................................................................31

    C.    Arizona Law, and Not That of Tennessee, Governs the Parties' Contractual Relationship ...................................................................31

D.    Swade's Challenges to the Contempt Order are Otherwise Meritless ........................................................................32

    1.    The District Court Properly Interpreted the Permanent Injunction .........................................................32

    2.    Neither the Permanent Injunction nor the Settlement Agreement Unlawfully Restrains Trade ...................39

    3.    The Contempt Finding Did Not Violate Swade's Constitutional Rights ..............................................44

III.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING SWADE RELIEF UNDER RULE 60(b) ...................46

A.    Swade's Rule 60(b) Arguments Were Untimely ................47

B.    In Denying Relief Under Rule 60(b)(1), the District Court Correctly Determined Any "Surprise" Was Unreasonable................50

C.    Swade's Failure to Present Relevant Evidence and Argument at Both Hearings Does Not Support Rule 60 Relief .............51

D.    Fender's Counsel Properly Invoked the Terms of the Permanent Injunction and Settlement Agreement....................54

IV.    THE DISTRICT COURT PROPERLY AWARDED FENDER'S FEES AND COSTS........................................................55

V.    CONCLUSION............................................................59

CERTIFICATE OF COMPLIANCE........................................60

CERTIFICATE OF SERVICE .............................................60

DESIGNATION OF RELEVANT COURT DOCUMENTS ................61

# TABLE OF AUTHORITIES

## Cases

*adidas Am., Inc. v. Payless Shoesource, Inc.*,
  529 F. Supp. 2d 1215 (D. Or. 2007) ...................................................40

*Allright Auto Parks, Inc. v. Berry*,
  409 S.W.2d 361 (Tenn. 1966)...........................................................44

*Alpha Tax Servs. v. Stuart*,
  761 P.2d 1073 (Ariz. Ct. App. 1988) ...............................................43

*Bed Mart, Inc. v. Kelley*,
  45 P.3d 1219 (Ariz. Ct. App. 2002) ..................................................43

*Browder v. Dir., Dep't of Corr. of Ill.*,
  434 U.S. 257 (1978) ..........................................................................30

*Brown v. Marshall*,
  704 F.2d 333 (6th Cir. 1983)..............................................................31

*Budinich v. Becton Dickinson & Co.*,
  486 U.S. 196 (1988) ................................................................. passim

*Cal. Packing Corp. v. Sun–Maid Raisin Growers*,
  165 F. Supp. 245 (S.D. Cal. 1958)....................................................40

*Carolina Power & Light Co. v. Dynegy Marketing & Trade*,
  415 F.3d 354 (4th Cir. 2005)....................................................... 27, 28

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991) ............................................................................57

*Chase Bank of Ariz. v. Acosta*,
  880 P.2d 11091 (Ariz. Ct. App. 1994)...............................................56

*Clorox Co. v. Sterling Winthrop, Inc.*,
  117 F.3d 50 (2d Cir. 1997)................................................................40

*Davis by Davis v. Jellico Cmty. Hosp. Inc.*,
  912 F.2d 129 (6th Cir. 1990).............................................................25

*Days Inn Worldwide, Inc. v. Patel*,
   445 F.3d 899 (6th Cir. 2006)...................................................................50

*Deran Mktg. Corp. v. Fisher Foods, Inc.*,
   787 F.2d 589 (6th Cir. 1986)...................................................................50

*Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*,
   637 F.2d 105 (3d Cir. 1980)....................................................................40

*Farmers Coop. Soc'y v. Leading Edge Pork LLC*,
   No. 16-CV-4034-LRR, 2017 WL 3496498 (N.D. Iowa Aug. 15, 2017) ...........28

*Flamm v. Am. Ass'n of Univ. Women*,
   201 F.3d 144 (2d Cir. 2000)....................................................................45

*Fleischmann Distilling Corp. v. Maier Brewing Co.*,
   386 U.S. 714 (1967) ...............................................................................57

*Gnesys, Inc. v. Greene*,
   437 F.3d 482 (6th Cir. 2005)............................................................. 29, 30

*Hasty v. Rent-A-Driver, Inc.*,
   671 S.W.2d 471 (Tenn. 1984)..................................................................44

*Henderson v. Jacobs*,
   239 P.2d 1082 (Ariz. 1952).....................................................................43

*Hopper v. Euclid Manor Nursing Home, Inc.*,
   867 F.2d 291 (6th Cir. 1989)............................................................. 49, 53

*Horne v. Flores*,
   557 U.S. 433 (2009) ...............................................................................39

*Innovation Ventures, LLC v. N2G Distrib.*,
   763 F.3d 524 (6th Cir. 2014)............................................................. 19, 38

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
   512 U.S. 821 (1994) ...............................................................................44

*John B. v. Emkes*,
   710 F.3d 394 (6th Cir. 2013)...................................................................39

iv

*Jordan v. Paccar, Inc.*,
No. 95-3478, 1996 WL 528950 (6th Cir. Sept. 17, 1996) ...................................54

*Koehler v. Cummings*,
380 F. Supp. 1294 (M.D. Tenn. 1971) .................................................................44

*Leonardi v. Furman*,
316 P.2d 487 (Ariz. 1957) ...................................................................................36

*Lewis v. Alexander*,
987 F.2d 392 (6th Cir. 1993) ......................................................................... 52, 53

*Liberis v. Craig*,
845 F.2d 326 (Table), 1988 WL 37450 (6th Cir. Apr. 25, 1988) .......................56

*Liberte Cap. Grp. v. Capwill*,
462 F.3d 543 (6th Cir. 2006) ...............................................................................25

*Loughrin v. United States*,
134 S. Ct. 2384 (2014) .........................................................................................35

*Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*,
679 F.3d 410 (6th Cir. 2012) ...............................................................................35

*NuMarkets, LLC v. Boyd*,
No. 1:04 CR 356, 2004 WL 3327267 (E.D. Tenn. Dec. 10, 2004) ....................44

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,
469 U.S. 189 (1985) .............................................................................................40

*Perotti v. Seiter*,
935 F.2d 761 (6th Cir. 1991) ......................................................................... 25, 58

*Pierce v. United Mine Workers of Am. Welfare & Ret. Fund for 1950 & 1974*,
770 F.2d 449 (6th Cir. 1985) ......................................................................... 48, 49

*Polo Fashions, Inc. v. Stock Buyers Int'l, Inc.*,
760 F.2d 698 (6th Cir. 1985) ...............................................................................33

*Ray Haluch Gravel Co. v. Central Pension Fund of International Union of Operating Engineers & Participating Employers*,
134 S. Ct. 773 (2014) ..................................................................................... 28, 30

*Redken Labs. v. Levin*,
843 F.2d 226 (6th Cir. 1988).......................................................... 56, 57

*Rolex Watch U.S.A., Inc. v. Crowley*,
74 F.3d 716 (6th Cir. 1996)................................................................56

*Scottsdale Ins. Co. v. Flowers*,
513 F.3d 546 (6th Cir. 2008)..............................................................31

*Searcy v. City of Dayton*,
38 F.3d 282 (6th Cir. 1994)................................................................31

*Sirrah Enterprises v. Wunderlich*,
399 P.3d 89 (Ariz. 2017)............................................................. 55, 56

*Tanner v. Yukins*,
776 F.3d 434 (6th Cir. 2015)..............................................................52

*Travelers Cas. & Sur. Co. of Am. v. J.O.A. Constr. Co.*,
479 F. App'x 684 (6th Cir. 2012) ......................................................54

*Tucker v. Byler*,
558 P.2d 732 (Ariz. Ct. App. 1976)....................................................36

*United States v. Brown*,
276 F.3d 211 (6th Cir. 2002)..............................................................25

*United States v. Dela Cruz*,
No. 17-mc-50236, 2017 WL 2262985  (E.D. Mich. May 23, 2017)..................35

*United States v. E.I. duPont de Nemours & Co.*,
351 U.S. 377 (1956).........................................................................40

*United States v. Reyes*,
307 F.3d 451 (6th Cir. 2002)..............................................................52

*United States v. Universal Mgmt. Servs.*,
191 F.3d 750 (6th Cir. 1999)..............................................................52

**Statutes**

Fed. R. App. P. 4 ....................................................................... 25, 53

Fed. R. App. P. 4(a) ........................................................................30

Fed. R. App. P. 4(a)(1)(A) .......................................................1

Fed. R. Civ. P.  60 ......................................................... passim

Fed. R. Civ. P.  60(b)(1) ................................................ passim

Fed. R. Civ. P. 54(a) ............................................................30

Fed. R. Civ. P. 54(b) ..................................................... 20, 47

Fed. R. Civ. P. 59 ......................................................... 20, 47

Fed. R. Civ. P. 60(b) ..................................................... passim

Fed. R. Civ. P. 60(b)(3) ................................................. 3, 54

Fed. R. Civ. P. 60(b)(5) ......................................................39

Fed. R. Civ. P. 60(b)(6) ......................................................47

Fed. R. Civ. P. 60(c) ..........................................................47

Fed. R. Evid. 408(2) ..........................................................12

**Other Authorities**

15 U.S.C. § 1051 .................................................................2

15 U.S.C. § 1114(1) ...........................................................37

15 U.S.C. § 1117 .................................................................6

15 U.S.C. § 1121 .................................................................2

15 U.S.C. § 1125(a) ...........................................................37

28 U.S.C. § 1332 .................................................................2

28 U.S.C. § 1338 .................................................................2

28 U.S.C. § 1338(a)-(b) .......................................................2

28 U.S.C. § 1367 .................................................................2

28 U.S.C. § 2107(a) ................................................... 1, 25, 30

42 U.S.C. § 1983 .................................................................................................2

**Rules**

4 J. Thomas McCarthy,
    *McCarthy on Trademarks and Unfair Competition* § 23:4 (4th ed.)...................37

## STATEMENT REGARDING ORAL ARGUMENT

Contrary to the characterization of it by appellants Kelton Swade and Kelton LLC (collectively "Swade"), this case is straightforward: Pursuant to a settlement agreement, Swade consented to the entry of a permanent injunction, was found in contempt, and failed to appeal that finding on a timely basis. No amount of oral argument will alter those events, change the text of the relevant documents, or create appellate jurisdiction where it otherwise does not exist. Likewise, Swade's claims present no "novel point of procedure," and the resignation of the first judge assigned to the case neither transforms it into a "somewhat complex" one nor calls into question his integrity or the competence of his successor. Appellee Fender Musical Instruments Corporation ("Fender") therefore submits that oral argument will unnecessarily delay the Court's disposition of this matter.

## STATEMENT OF JURISDICTION

No appellate jurisdiction exists over the District Court's April 7, 2017, order finding Swade in contempt of its earlier permanent injunction and in breach of the parties' settlement agreement (the "Contempt Order"). The Contempt Order was final and appealable upon its issuance, and Federal Rule of Appellate Procedure 4(a)(1)(A) and 28 U.S.C. § 2107(a) therefore required Swade to notice an appeal from it within thirty days, *i.e.*, by May 6, 2017.

Swade, however, failed to do so until November 29, 2017. Because the May 6, 2017, deadline was mandatory and jurisdictional, and because the pendency of Fender's fee petition did not toll it, this Court lacks jurisdiction over the challenges to the Contempt Order in Sections II-VIII of Swade's brief.

Contrary to Swade's mistaken citation to 42 U.S.C. § 1983, the District Court had subject-matter and supplemental jurisdiction over this action under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1338, 1332, 1338(a)-(b), and 1367, in light of Fender's claims under the Lanham Act, 15 U.S.C. § 1051 *et. seq.*

## STATEMENT OF ISSUES

1.     Whether Swade's failure to appeal the Contempt Order for seven months and twenty-two days after its issuance deprives this Court of appellate jurisdiction over that order.

2.     Whether Swade waived his arguments that the settlement agreement and permanent injunction are unenforceable by failing to raise those arguments below.

3.     Whether the settlement agreement and permanent injunction are unenforceable as ambiguous, unfair, and unreasonable, or unfair restraints on trade, even though: (1) Swade voluntarily entered into the former and agreed to entry of the latter following extensive negotiations: (2) neither prohibits Swade from

practicing his trade in direct competition with Fender; and (3) the injunction protects Fender's valuable trademark rights.

4.      Whether the imposition of sanctions violated Due Process despite Swade's receipt of numerous notices from Fender and the District Court of the ground on which the District Court based those sanctions.

5.      Whether the District Court abused its discretion in denying Swade's two motions under Federal Rule of Civil Procedure 60(b), filed five months and seven months after the Contempt Order, because: (1) the motions were untimely; (2) Swade did not suffer "surprise" pursuant to Rule 60(b)(1) by the application of the "in any way similar to" standard in the settlement agreement and the permanent injunction; (3) Fender made no "misrepresentation" under Rule 60(b)(3) in relying on that standard; and (4) Fender and the District Court repeatedly advised Swade of that reliance.

6.      Whether the District Court abused its discretion in awarding Fender's attorneys' fees and costs under the express fee-shifting provisions contained in the parties' settlement agreement and the agreed-upon permanent injunction.

## STATEMENT OF THE CASE

### A.      Swade's Counterfeiting and Infringement of Fender's Registered Trademarks

Fender is a leading manufacturer of electric guitars and related equipment. In the 1950s, Fender's predecessor introduced instruments

3

eventually called Telecaster® and Stratocaster® guitars. The Tele® and Strat®, as those guitars are often called, are widely used among professional and amateur players and among the most popular electric guitars in musical history.

Fender has long used numerous trademarks (standing alone or with design elements) to identify the source and quality of those guitars. Fender owns, *inter alia*, trademarks consisting of the words Fender®, Stratocaster®, Strat®, and Telecaster®, as well as the shapes of the headstocks used for Fender guitars, including Stratocaster® and Telecaster® guitars. More specifically, in addition to other registrations from the U.S. Patent and Trademark Office not relevant to this appeal, Fender owns, *inter alia*, the following trademark registrations covering its headstock designs ("Fender's Marks"):

| Trademark | Reg. No. | Reg. Date | Goods |
|---|---|---|---|
|  | 1,148,869 | 3/24/1981 | Electric guitars |

| | | | | |
|---|---|---|---|---|
|  | 1,148,870 | 3/24/1981 | Electric guitars |
|  | 2,163,733 | 6/9/1998 | Electric guitars and electric bass guitars, and necks for electric guitars and electric bass guitars |

Fender sued Swade for trademark infringement and related claims based on Swade's manufacture and sale of guitars incorporating infringing copies of trademarks owned by Fender, including the registered headstock trademarks reproduced immediately above.[1] Complaint, RE 1. Although Swade's guitars resemble Fender's, their quality is well below that of Fender's instruments. Contempt Motion Declaration, RE 113-2, 113-3, PageID# 1728-1830.

**B.    Swade's Agreement to Stop Using Guitar Headstocks "in any Way Similar to" those of Fender and his Consent to Injunctive Relief Memorializing That Standard**

Fender raised its concerns with Swade before filing this action and tried to resolve the dispute even during the proceedings below. After eighteen

---

[1] In addition to infringement of Fender's registered headstocks, Fender's complaint alleged infringement of its Fender logo®, STRATOCASTER®, STRAT®, TELECASTER®, TELE®, and RELIC® trademarks. Complaint, RE 1 ¶¶ 2-24.

months of negotiations, the parties executed an October 7, 2014, settlement agreement prohibiting Swade from, inter alia, selling guitars with headstocks "in any way similar to" those of Fender. Settlement Agreement, RE 120 sealed entry, page 6 ¶ 6. Under that agreement, in which Fender made numerous concessions,[2] the parties requested Chief Judge Sharp, to whom the case was then assigned, to enter a consent judgment and permanent injunction restraining Swade's activities. Joint Motion for Entry of Final Judgment, RE 91, PageID# 1228. Judge Sharp conferred with the parties, and, only after certain modifications, Renewed Joint Motion, RE 93, PageID# 1245, did he enter the Final Judgment and Permanent Injunction, RE 94 ("Consent Judgment" or "Permanent Injunction") on November 12, 2014.

That document recites Fender's entitlement "to judgment on each of the causes of action asserted in its First Amended Complaint" and dismisses Swade's challenges to the validity of Fender's Marks with prejudice. Permanent Injunction, RE 94, PageID# 1262, 1265. Paragraph 2 of its injunctive relief section provides that Swade, *inter alia*:

---

[2] Had Fender successfully pursued its claims through trial, it might have recovered its actual damages and an accounting of Swade's profits, or, alternatively, statutory damages between $1,000 and $2,000,000 per Fender mark appropriated. In settling, Fender waived its right to that relief, as well as to reimbursement of its attorneys' fees and taxation of its costs. *See* 15 U.S.C. § 1117.

b. shall completely cease all use whatsoever, directly or indirectly, of the FENDER Marks, or any confusingly similar imitations thereof, in connection with Defendants' guitars or business, or other goods or services, including without limitation in connection with the sale, advertising or promotion of Defendants' goods or services;

c. shall completely cease using, directly or indirectly, any trademark, service mark, name, logo, design, source designation, or identifying characteristic of any kind that is a copy, reproduction, colorable imitation, or simulation of or confusingly similar to, or in any way similar to or likely to dilute the distinctiveness of, the trademarks, service marks, or logos, designs, source designations, or identifying characteristics of Fender, or is likely to cause confusion, dilution, mistake, deception, or public misunderstanding that Defendants' guitars or business, or other goods or services are the guitars, business, goods or services of Fender, or are sponsored, licensed, endorsed, approved by, affiliated with, or in any way related to Fender or its guitars;

d. … shall remove all references to or depictions of the FENDER Marks, or any confusingly similar imitations thereof, from any advertising or promotional materials used in connection with their business ….By way of example and not limitation, such removal of references to the FENDER Marks may be accomplished by means of the following: … (b) elimination or modification of photographs depicting the FENDER Marks (e.g., cropping photographs of Defendants' guitars to remove imagery of head stock designs owned by Fender); and (c) elimination or modification of audio or video depicting or referencing the FENDER Marks (e.g., … (as an alternative to the disclaimer provided in Paragraph 3 blurring or otherwise obscuring the imagery of head stocks of Kelton Swade guitars to modify depictions of head stock designs owned by Fender);

e. shall re-design the head stocks of his guitars using paddle necks or other raw material, such that any new guitars … that are thereafter sold or offered for sale by Defendants after the entry of this Consent Judgment have a unique head stock design that is neither identical to nor will create a likelihood of confusion with any head stock design owned by Fender ….

*Id.*, PageID# 1262-1263 ¶¶ 2(b)-(e). Swade acknowledged he understood "the undertakings, obligations, and terms" of the Permanent Injunction, RE 94, PageID# 1266, ¶ 5, and certified his compliance with its terms, including Paragraph 2.c. Certificate of Compliance, RE 95, PageID# 1270.

**C.    Swade's Violation of the Settlement Agreement and Permanent Injunction**

Despite his certification, Swade continued using headstocks similar in many ways to Fender's Marks. Contempt Motion, RE 96-1, PageID# 1281-1289. Indeed, what Swade's counsel *admitted* to the District Court were Swade's merely "incremental[]" post-injunction changes, Swade Opposition to Contempt Motion, RE 99, PageID# 1546-47, appearing in the following graphic showing red outlines of Fender's Marks superimposed on Swade's headstocks:



Fender Sur-reply to Motions for Reconsideration, RE 156, PageID# 2515.

Because the multiple similarities between Swade's headstocks and Fender's Marks violated the "in any way similar to" and other provisions of the Settlement Agreement and the Permanent Injunction, Fender sought relief from the District Court.

### D. The District Court's Consideration of the Contempt Motion and the Failure of Swade's Counsel to Familiarize Himself With Fender's Moving Papers

Swade's claimed unawareness of Fender's reliance on the "in any way similar to" prohibition contained in paragraph 2.c of the Permanent Injunction

until the hearings in this matter defies credulity.[3] It is flatly irreconcilable with

the repeated references to that standard in Fender's pre-filing correspondence,

moving papers, statements in open court, and expert testimony. It is equally

inconsistent with the District Court's repeated warnings to Swade's counsel

during both hearings on Fender's motion that he had failed to address that

standard.

To begin with, and as Swade's response to Fender's motion conceded,

Swade Opposition to Contempt Motion, RE 99, PageID# 1546-47, Fender's in-

house attorney, Mark Van Vleet, provided Swade with ample notice of

Fender's intent to enforce the "in any way similar to" restriction:

> [Fender] intends to pursue a claim for breach of the settlement
> agreement on the grounds that the guitar headstock designs that you
> have been using and apparently continue to use are a "'copy,
> reproduction, colorable imitation, or simulation of or confusingly
> similar to, *or in any way similar to* or likely to dilute the
> distinctiveness of," [Fender's] registered headstock designs
> trademarks (commonly known as the "STRAT" and "TELE"
> headstock designs).

Contempt Motion Exhibit, RE 96-1, PageID# 1309 (emphasis added).[4]

---

[3] Swade alternatively claims to have been surprised at: (1) the first hearing on
February 9, 2017; (2) the second hearing on March 3, 2017 (mistakenly described
by Swade as the "April hearing"); and (3) the (nonexistent) "trial." Appellant's
Brief at 9, 11, 16, 43.

[4] The emails between Mr. Van Vleet and Swade—on which Swade himself
affirmatively relies numerous times, Appellant's Brief at 16, 41, 49, 54—were not
part of settlement negotiations and thus are not inadmissible under Federal Rule of
Evidence 408, as Swade argues.

As stated on our telephone call and reiterated below, [Fender] believes that the guitar headstock designs that you have been using and apparently continue to use are a "copy, reproduction, colorable imitation, or simulation of or confusingly similar to, *or in any way similar to* or likely to dilute the distinctiveness of," [Fender's] registered headstock designs trademarks (commonly known as the "STRAT" and "TELE" headstock designs).

*Id.*, PageID# 1357 (emphasis added).

Kelton, I know your position is that you've done nothing wrong and that you've tried to accommodate FMIC's requests. As we've communicated previously, FMIC respectfully disagrees with your position and believes that your "new" headstock designs are not unique and are *similar to* FMIC's registered headstock designs, which FMIC further believes is a violation of the Consent Judgment....

Ultimately, all of the cost, time and disruption to everyone involved in a legal battle can be resolved if you redesign your headstocks such that they are unique and not *similar to* FMIC's trademarked headstock designs (as many, many others before you have.)

*Id.*, PageID# 1312 (emphasis added).[5]

___

[5] Swade inaccurately claims "[f]or many months, without notice to Swade's counsel, [Fender's] in-house attorney … engaged in a lengthy ex parte email exchange with Swade about his design process." Appellant's Brief at 8. The Settlement Agreement required service of any notice of breach directly on Swade—a provision agreed upon to mitigate future attorneys' fees. Supplemental Contempt Memo, RE 115, sealed document page 10; Reply in support of Fees, RE 134, Page ID# 2271. Moreover, contrary to Swade's claim Fender should have contacted Mr. Carreon about the breach, Mr. Carreon was not even Swade's attorney as of the July 2015 notice. Indeed, after Fender's in-house attorney contacted Swade in 2015, Swade did not respond he was represented by Mr. Carreon or any other attorney. Swade instead communicated with Fender for nearly a year before referring Fender to an attorney named Jessica Ponce. Contempt Order Exhibit, RE 96-5, Page ID# 1348-56. Fender accordingly communicated with Ms. Ponce until Mr. Carreon sent Fender a July 31, 2016, email stating he was "*returning* to [his] seat at the table as [Swade's] counsel." *Id.*, Page ID# 1347 (emphasis added).

After over a year trying to gain Swade's compliance, and two months after circulating its moving papers for Swade's review, Fender filed its motion. Fender's opening brief provided Swade with *additional* notices of Fender's reliance on Swade's violations of the "in any way similar to" language. Specifically, that brief recited:

> [I]n plain derogation of the clear terms of the Injunction, Swade is directly using designs and identifying characteristics that are copies, reproductions, colorable imitations, or simulations of or are confusingly similar to, or in any way similar to or likely to dilute the distinctiveness of the trademarks, designs, source designations, or identifying characteristics of Fender, or are likely to cause confusion, dilution, mistake, deception, or public misunderstanding that Swade's guitars or business are sponsored, licensed, endorsed, approved by, affiliated with, or in any way related to Fender or its guitars. More specifically, all of Swade's current guitar headstock designs are clear copies, reproductions, colorable imitations, or simulations of, or are confusingly similar to, and certainly "*in any way similar to* or likely to dilute the distinctiveness of," Fender's trademarks (namely Reg. Nos. 1,148,870 and 2,163,733), designs, source designations, and identifying characteristics, as prohibited by the Injunction.

Contempt Motion, RE 96-1, PageID# 1281. The italics appear in the original brief to call attention to that language.

---

Swade also mistakenly argues the e-mail notices of his breach—upon which Swade himself affirmatively relies on numerous times, Appellant's Brief at 16, 41, 49, 54—are inadmissible under Federal Rule of Evidence 408(2). In fact, the emails were not part of a settlement negotiation but rather an attempt to enforce the injunction. Nor are they offered to "prove the validity, invalidity, or amount of a disputed claim"; the emails establish Swade's notice of Fender's intent to enforce the Injunction. Rule 408(2) thus is inapplicable.

Swade received similar notices in Fender's reply brief, which again referenced the "in any way similar to" standard, and, indeed, characterized it as the "sole question" presented by Fender's motion:

> [T]he sole question is whether Defendants violated the Injunction by using headstocks "in any way similar to" Fender's, and the undisputed evidence shows they have.
>
>     ….
>
>     … Even if all of Fender's evidence were excluded, images provided by Defendants themselves, alone prove Defendants used headstocks "in any way similar" to Fender's, and thus violated the Injunction.

Contempt Motion Reply, RE 104, PageID# 1626, 1630.

Judge Sharp scheduled a February 9, 2017, hearing. In light of Fender's repeated references to the "in any way similar to" standard, how Swade and his counsel *arrived* at the hearing unaware that standard was at issue is not apparent. Less apparent still is how they *departed* under the same misimpression after observing Fender's counsel argue:

> Mr. Swade has ignored his obligations under paragraph … 2C of this Court's order to avoid using guitar headstocks that are, quote, "in any way similar to those of Fender."
>
>     ….
>
>     … And the inquiry, … according to … the Court's order is: Are these headstocks in any way similar to those of Fender?"
>
>     ….
>
>     … [O]nce again, the Court can see here another example of the use of a headstock that cannot be considered not, in any way, similar to Fender's federally registered Telecaster headstock.

Transcript, RE 110, PageID# 1652:13-16, 1653:15-17, 1654:21-24.[6] Had

Fender disingenuously articulated the basis of its motion in its papers and oral

argument, the point undoubtedly would have been lost on the District Court.

Yet Judge Sharp both understood Fender's position and repeatedly warned

Swade's counsel of his failure to address the proper standard:

> [A]ren't we talking about now whether or not they're in any way similar?
> ....
> ... [I]n order to comply, it cannot be in any way similar; right?
> ....
> ... [T]he language in the consent judgment says: Can't do – have
> anything that's in any way similar ... right?
> ....
> ... Well, we are talking about is it in any way similar?

*Id.*, PageID# 1659:4-5, 1660:19-20, 1662:8-10, 1672:25-1673:1.

After requesting expert witness testimony, Judge Sharp ultimately held a

second hearing on March 3, 2017.[7] Before that hearing, Fender served and then

filed the expert declaration of Bruce Pirecki. Fender Expert Report, RE 113-1.

Mr. Pirecki opined that "Swade has violated the 'in any way similar to'

language in the Consent Decree because there are numerous similarities

---

[6] As set forth above, Fender's opening argument was *not* the first time it relied on the "in any way similar to" standard; the contrary claim on pages 8-9 of Swade's brief is mistaken.

[7] Page 15 of Swade's brief suggests Judge Sharp ruled in Swade's favor as to one of the guitar models at issue following the February 9, 2017, hearing. Nothing of the sort occurred: Indeed, except for the quantum of monetary relief sought by Fender, his ultimate ruling completely vindicated Fender's position.

between his headstock designs and Fender's registered designs." *Id.*, PageID# 1705, ¶ 12. His report used "similar to" an additional *twenty-nine times*, opining on whether various third-party designs and Swade's designs were "similar to" Fender's Marks. Significantly, Mr. Pirecki offered thirty-three designs in "no way similar to Fender's designs" to illustrate the myriad alternatives available to Swade. *Id.*, PageID# 1707-1710, ¶¶ 17-22.

Moreover, to confirm the relevant standard, Fender's supplemental brief before the second hearing explained:

> [O]ne of the several relevant standards for determining if Mr. Swade has violated the Court's injunction is whether Mr. Swade's headstocks are "in any way similar to" Fender's registered headstock designs. Paragraph 2.c of the Court's Permanent Injunction and Order enjoins Mr. Swade from using trademarks that are "in any way similar to" Fender's registered marks, and Mr. Swade undertook in the parties' Settlement Agreement to refrain from use of marks that are "in any way similar to" Fender's registered designs. As a result, there should be no dispute as to the applicable standard.
>
> ....
>
> Mr. Swade has contemptuously violated this Court's prohibition on his use of designs that are 'in any way similar' to Fender's registered marks. That Mr. Swade may be in contempt for the *additional* reasons that his designs are (1) likely to be confused with Fender's marks, (2) likely to dilute the distinctiveness of Fender's marks, and (3) confusingly similar to Fender's marks merely reinforces Fender's entitlement to relief but is not necessary to it.
>
> ....
>
> ... [T]he *"in any way similar" standard is a standalone basis for liability,* even if Mr. Swade's ongoing use of designs is likely to cause confusion with, and is likely to dilute the distinctiveness of, Fender's registered marks. Because both sets of Mr. Swade's original post-injunction headstocks are "similar to" Fender's registered headstock marks in numerous respects, the Court should find Mr.

> Swade in contempt of the Consent Judgment during the period of time
> he used them ....”

Supplemental Contempt Brief, RE 115, sealed document at 2, 3, 5. Once again,

the italics appear in the original to emphasize Fender's reliance on the "in any

way similar standard [as] a standalone basis for liability." Fender did not hide

these points in a footnote or otherwise obscure them but instead asserted them

below a bold-type heading reading, "**This Court's Order Prohibits Mr.**

**Swade From Using Designs 'In Any Way Similar To' Fender's Registered**

**Marks**." *Id.*, Page 3.

Not only did Swade have ample notice *before* the second hearing of

Fender's reliance on "in any way similar to" standard, those notices continued

*at* the hearing. For example, Fender's opening statement included the

following reference:

> Moving on to the operative language of the agreement and of the
> order -- and this is Paragraph 2-C, and the Court focused on this at the
> last hearing -- there are a number of things prohibited by this
> provision. But the one that has greatest significance is, of course, the
> prohibition on the defendants' use of any design that is in any way
> similar to the trademarks or designs of Fender. This is the operative
> language, your Honor.

Transcript, RE 124, PageID# 1937:2-9. When Swade's counsel asserted the

standard was "confusingly similar," that error triggered additional warnings

from Judge Sharp:

THE COURT: It's not whether they discern between a Swade guitar and a Fender guitar or headstock, right? It's the question, are they in any way similar to, right? So whether or not, you know, a professional musician could tell the difference, is that really the question that's answered here, or is it are they similar to each other? Has it gotten far enough away?

MR. CARREON: And I think that that really is – what was really the issue is whether we can take a legal term such as "confusingly similar," delete --

THE COURT: Delete the word "confusingly," because that's not in here; it's just, is it in any way similar to? But your client agreed to it. So here is his language that became a court order.

So is it in any way similar to? That's what this is about.

*Id.*, PageID# 1963:13-1964:2.

Lest there be any doubt concerning Fender's reliance on the "in any way similar to" standard, Swade and his counsel heard Mr. Pirecki's expert testimony as to particular headstocks *not* "in any way similar to" Fender's Marks and the many similarities between Fender's Marks and Swade's headstocks. *Id.*, PageID# 1943-1955. They also heard Judge Sharp's questioning of Swade's expert concerning that standard, which produced the following colloquy (and ultimately fatal concessions) about the parties' respective designs:

THE COURT: Well, are they in any way similar?
THE WITNESS: They're somewhat similar but they're similar all over the place all over the business.
….
THE COURT: I was asking if they were in any way similar.
THE WITNESS: I would say sure.

Transcript, RE 124, PageID# 1989:8-21. Indeed, even on direct examination by Swade's own counsel, that expert volunteered, "[t]here are some similarities; I'm not going to argue." *Id.* at 1992:12-13.

Finally, the absurdity of the claim that Fender "sandbagged" Swade's inattentive lead counsel[8] is documented in Fender's closing statement:

> As the Court properly determined at the earlier hearing and as it properly has determined in this case, it is not a question as to whether there are similarities and dissimilarities in total; it's a question of whether these designs are in any way similar. That's the language of this Court's order, and that is the language in the parties' agreement.

*Id.* at 2017:8-13.

Judge Sharp ultimately found Swade in contempt of the "in any way similar to" standard memorialized in the Consent Injunction and in breach of the Settlement Agreement's identical language. Contempt Order, RE 123, PageID# 1928. As he explained:

> Swade agreed not to use "any trademark ... or identifying characteristic of any kind that is a copy, reproduction, colorable imitation, or simulation of or confusingly similar to, or in any way similar to" Fender's Telecaster and Stratocaster headstock designs. Therefore, Fender may prove that Swade is in contempt of the Agreement and Permanent Injunction by showing that Swade's new designs are "in any way similar to" Fender's. The test is not, as Swade argues, whether his designs exhibit "substantial dissimilarity," or "complete dissimilarity," or whether they are "sufficiently distinguishable," or "sufficiently dissimilar," from Fender's.

---

[8] Swade was represented before the District Court by two attorneys: The record contains no averment the second failed to appreciate the significance of Fender's reliance on the "in any way similar to" standard.

Contempt Memorandum, RE 122, PageID# 1922 (citations omitted). After thus referencing that agreed-upon standard, Judge Sharp observed that "[h]aving listened to the testimony of each party's expert, having considered their demeanor and interests, and having weighed the evidence, the Court finds that Fender has presented clear and convincing evidence that Swade's new headstock designs violate the 'in any way similar to' language of the Agreement and Permanent Injunction." *Id.*, PageID# 1923. That finding was informed by this Circuit's "safe distance rule," which prevents "known infringers from using trademarks whose use by non-infringers would not necessarily be actionable." *Id.*, PageID# 1924 (quoting *Innovation Ventures, LLC v. N2G Distrib.*, 763 F.3d 524, 544 (6th Cir. 2014)).

### E.    The Parties' Post-Contempt Order Motion Practice and Swade's Failure to Notice a Timely Appeal of the Contempt Order

The Contempt Order imposed $50,000 in liquidated damages for Swade's violations of the Settlement Agreement and instructed Fender to document its attorneys' fees. Following briefing on that issue and Judge Sharp's resignation, Chief Judge Crenshaw held that "[b]oth the Settlement Agreement and the Final Judgment and Permanent Injunction Order provide that, if Swade violates the Permanent Injunction or breaches the Settlement Agreement, Fender is entitled to recover its attorneys' fees and costs in enforcing the Order and Agreement." Attorneys' Fee Order, RE 135, PageID#

2282. He therefore found "[t]here is no issue that Fender is entitled to an award of attorneys' fees in this case. That decision was made in the [Contempt Order] and agreed to by the parties ...." *Id*. Although ordering a reduction in Fender's attorneys' hourly rates, *id.*, PageID# 2287-88, he otherwise granted Fender's request for an award of $119,671.15 on October 30, 2017. Final Attorneys' Fee Order, RE 143, PageID# 2352.

Despite this extensive motion practice relating to Fender's fees, Swade failed to challenge the Contempt Order itself for five months and nine days after the order issued, nor did he request an extension of time to do so. Instead, Swade waited until September 16, 2017, before seeking reconsideration of the Contempt Order under Rule 54(b) based on the District Court's alleged error in applying the "in any way similar standard." Reconsideration Motion, ER 139. That motion was accompanied by a declaration from Swade's counsel characterizing his unpreparedness to address the "in any way similar to" prohibition as "excusable neglect" and his failure to have Swade testify as "an error on my part." Reconsideration Motion Declaration, RE 139-3, PageID# 2336-37.

On November 27, 2017, Swade filed a motion seeking a "new trial" pursuant to Rules 59 and 60(b), also based on the District Court's allegedly erroneous reliance on the "in any way similar to" standard and further accusing

20

Fender of misconduct based on its reliance on that standard. New Trial Motion, ER 153. The same motion and an unauthorized sur-reply brief accused Judge Sharp of witness intimidation,[9] "judicial misconduct," an "unconscionable betrayal of [Swade's] reasonable expectations," "unfair judgment," and unspecified other general "misconduct." *Id.*, PageID# 2498-2500; Objections to Sur-Reply, RE 157, PageID# 2528.[10] The motion did not request an amendment to the Permanent Injunction under Rule 60(b)(1) as inequitable.

Not until November 29, 2017—seven months and twenty-two days after the Contempt Order—did Swade finally appeal that order to this Court.[11] Following that, the District Court denied Swade's post-Contempt Order motions in a single February 5, 2018, order finding them, *inter alia*, "absurd," "untimely," "incorrect," "mistaken," "baseless," and "unreasonable," as well as having "no applicability," "no basis," and "no justification." Reconsideration

---

[9] Swade complained his expert witness was unprepared to testify about the "in any way similar to" standard but that Judge Sharp nevertheless expected him to. Reconsideration Motion Reply, ER 153, Page ID# 2499.

[10] Page 53 of Swade's brief doubles down on this disrespect for the District Court, suggesting all decisions by Judge Sharp after he announced his resignation are suspect and questioning Judge Crenshaw's ability to familiarize himself with the modest record associated with Fender's motion.

[11] On December 22, 2017—nearly a month after his notice of appeal—Swade included in his reply brief in support of his "motions for reconsideration, new trial and Rule 60 relief" a request under Rule 58(e) for an extension of the appeal deadline. Reconsideration Motion Reply, ER 153, Page ID# 2496-98. The District Court denied that request as untimely, and Swade has not appealed the denial.

Order, ER 158, PageID# 2540-43. Judge Crenshaw rejected Swade's motion

for a new trial for the obvious reason that no trial had occurred in the first

place. *Id.*, PageID# 2540-41. He also denied Swade's motion for

reconsideration because the Contempt Order was final immediately on its

issuance and Swade's Rule 54-based challenges to it therefore untimely. *Id.*,

PageID# 2543.

Addressing Swade's Rule 60(b) motion, Judge Crenshaw rejected

Swade's claimed surprise at Fender's having allegedly misled Judge Sharp into

applying "in any way similar to" standard because: (1) the Settlement

Agreement, Permanent Injunction, and Fender's papers repeatedly referenced

that standard, *id.*, PageID# 2542; and, therefore (2) "[t]o the extent Swade

forgot or misunderstood that he agreed to the phrase 'in any way similar to,' or

to the extent Swade was not prepared to address that standard, those

circumstances were created by Swade and his counsel alone." *Id.*, PageID#

2543. Finally, and in any case, Judge Crenshaw noted that "[t]he Court was not

misled … because the phrase 'in any way similar to' was clearly a part of the

parties' agreement and the Permanent Injunction." *Id.*

## SUMMARY OF ARGUMENT

No appellate jurisdiction exists over the Contempt Order. That order was

final and appealable upon its issuance on April 7, 2017, and Swade's

November 29, 2017, notice of appeal therefore was *over six months* late. Swade's claim that the pendency of Fender's motion for attorneys' fees tolled the May 6, 2017, appeal deadline is so contrary to authority from the Supreme Court and this Court as to render that claim frivolous. The Court therefore need not—and *cannot*—entertain the attacks on the Contempt Order in Sections II-VIII of Swade's brief.

The other bases of Swade's appeal are equally frivolous. By failing to raise them below, Swade has waived the arguments in Sections III-V of his brief. Likewise, Sections III and V of his brief mistakenly invoke Tennessee law, rather than Arizona law, the latter of which governs the Settlement Agreement, and under which Swade has failed to advance any arguments.

Even if the Court overlooks these procedural infirmities and considers the merits of Swade's claims, those claims are fatally deficient. Specifically:

- neither Judge Sharp nor Judge Crenshaw erred when holding Swade to the "in any way similar to" standard memorialized in the Settlement Agreement and the Permanent Injunction, to both of which Swade agreed;

- settlement agreements prohibiting imitations of trademarks do not unlawfully restrain defendants or negatively affect the public interest

if, as here, they preserve the defendants' ability to practice their trades under different marks;

- Swade received repeated notices of the primary ground on which the District Court found him in contempt, and the failure of Swade's counsel to avail himself of multiple opportunities to address that ground did not work a violation of his client's constitutional rights;

- based on the record before it, which included critical concessions by Swade's own expert witness, the District Court did not abuse its discretion by finding Swade in contempt;

- based on mandatory fee-shifting provisions in the parties' Settlement Agreement and the Permanent Injunction, the District Court did not abuse its discretion in awarding Fender the fees and costs incurred in prosecuting its motion;

- the repeated notices of Fender's reliance on the "in any way similar to" prohibition expressly memorialized in the Settlement Agreement and Permanent Injunction preclude Swade from arguing misconduct by Fender's counsel falling within the scope of Rule 60 or surprise at Fender's arguments; and, in any case,

- the Court should reject Swade's invocation of Rule 60 as an impermissible attempt to bypass the missed deadline for Swade to appeal the Contempt Order.

## ARGUMENT

## I.   STANDARDS OF REVIEW

This Court addresses appellate jurisdiction on a de novo basis. *See United States v. Brown*, 276 F.3d 211, 214 (6th Cir. 2002) ("We review questions of jurisdiction de novo."). The standard of review applicable to the District Court's finding of contempt, its award of attorneys' fees to Fender, and its denial of Swade's Rule 60(b) motion is that of an abuse of discretion. *See Liberte Cap. Grp. v. Capwill*, 462 F.3d 543, 550 (6th Cir. 2006) (contempt); *Perotti v. Seiter*, 935 F.2d 761, 763 (6th Cir. 1991) (attorneys' fees); *Davis by Davis v. Jellico Cmty. Hosp. Inc.*, 912 F.2d 129, 132–33 (6th Cir. 1990) (Rule 60(b) motions).

## II.   THIS COURT SHOULD REJECT SWADE'S CHALLENGES TO THE APRIL 7, 2017, CONTEMPT ORDER

### A.   No Appellate Jurisdiction Exists Over the Contempt Order

Swade's appeal of the Contempt Order, taken over seven months after the order issued, was untimely under both F.R.A.P. 4 and 28 U.S.C. § 2107(a), and jurisdiction does not exist over his challenges to it. The arguments in

Sections II-VIII of Swade's brief therefore are not properly before the Court, which should dispose of them without considering their merits.

Swade's claim the Contempt Order was not final until the October 30, 2017, grant of Fender's revised fee petition is incorrect. Specifically, in *Budinich v. Becton Dickinson & Co*., 486 U.S. 196 (1988), the Supreme Court addressed the issue of whether a decision is "final" and thus appealable even though the issue of the recoverability or amount of the prevailing party's fees remains pending. Although Swade asserts he "preserved his right to appeal the [Contempt] Order under the authority of *Budinich*," Appellants' Brief at 33, *Budinich* in fact demonstrates why Swade's notice was late and his claim of appellate jurisdiction flawed.

The petitioner in *Budinich* prevailed on his claims at trial. Dissatisfied with the jury's award of monetary relief, he pursued motions for a new trial, which the District Court denied on May 14, 1984. He then failed to appeal the denial of the motions until the District Court decided his separate request for attorneys' fees, which occurred on August 1, 1984. When the petitioner appealed the denial of the new trial motions on August 29, 1984—within thirty days of the grant of his fee petition but four months after the denial of the motions—the Tenth Circuit dismissed the appeal for want of appellate

jurisdiction. *See Budinich v. Becton Dickinson & Co.*, 807 F.2d 155, 159 (10th Cir. 1986), *aff'd*, 486 U.S. 196 (1988).

The Supreme Court affirmed. It held the notice of appeal untimely based on the "uniform rule that an unresolved issue of attorney's fees for the litigation in question does not prevent judgment on the merits from being final." *Id.* at 202. It explained, "a claim for attorney's fees is not part of the merits of the action to which the fees pertain. Such an award does not remedy the injury giving rise to the action, and indeed is often available to the party defending against the action." *Id.* at 200. Specifically, "[c]ourts and litigants are best served by the bright-line rule … that a decision on the merits is a 'final decision' ... whether or not there remains for adjudication a request for attorney's fees attributable to the case." *Id.* at 202-03. Consequently, "[s]ince the Court of Appeals properly held petitioner's notice of appeal from the decision on the merits to be untimely, and since the taking of an appeal within the prescribed time is mandatory and jurisdictional, the Court of Appeals was without jurisdiction to review the decision on the merits." *Id.* at 203 (citations omitted).

Swade's attempt to escape *Budinich* by invoking *Carolina Power & Light Co. v. Dynegy Marketing & Trade*, 415 F.3d 354 (4th Cir. 2005), fails to recognize the Supreme Court's abrogation of *Carolina Power* in a 2014

27

opinion both reaffirming *Budinich*'s "uniform rule" and confirming its applicability to this appeal.[12] In *Ray Haluch Gravel Co. v. Central Pension Fund of International Union of Operating Engineers & Participating Employers*, 134 S. Ct. 773 (2014), the respondents—like Swade here—sought to distinguish *Budinich* because the petitioner's fee petition was contract-based, rather than statutory. The Court rejected that argument because "[w]hether the claim for attorney's fees is based on a statute, *a contract*, or both, the pendency of a ruling on an award for fees and costs does not prevent, as a general rule, the merits judgment from becoming final for purposes of appeal." *Id.* at 777 (emphasis added). Moreover, "the entry of judgment ordinarily may not be delayed, nor may the time for appeal be extended, in order to tax costs or award fees." *Id.* at 781.[13]

Beyond ignoring controlling Supreme Court authority establishing the untimeliness of his appeal, Swade mistakenly characterizes *Budinich* as

---

[12] Even the most basic due diligence would have alerted Swade to the defunct status of *Carolina Power* prior to his imposition on the Court of four pages of briefing based on it.

[13] Swade's other proffered opinions—including the very First Circuit opinion reversed by the Supreme Court in *Ray Haluch*, *see* Appellant's Brief at 27 n.4—are equally bad law: With one exception, each predates *Ray Haluch*'s extension of *Budinich*'s "uniform rule" to contract-based claims for fees. The exception, *Farmers Coop. Soc'y v. Leading Edge Pork LLC*, No. 16-CV-4034-LRR, 2017 WL 3496498 (N.D. Iowa Aug. 15, 2017), repeats the same error leading the Supreme Court to abrogate *Carolina Power* and addresses neither appellate jurisdiction nor the calculation of appeal deadlines.

28

"notoriously difficult to interpret," Appellants' Brief at 33, and erroneously claims there is no relevant Circuit authority doing so. In a factually similar case, *Gnesys, Inc. v. Greene*, 437 F.3d 482 (6th Cir. 2005), this Court applied *Budinich* to hold that a finding of contempt is a final decision, despite the pendency of a fee petition. In *Gnesys*, the parties settled the plaintiff's claim for unfair competition. *Id.* at 484. After the defendants breached the agreement, the District Court found them in contempt in November 2002. *Id.* It then entered an August 2003 order awarding damages to the plaintiff, followed by a July 2004 order awarding the plaintiff's fees. *Id.* The defendants appealed all three orders.

Much like Swade here, the defendants argued the August 2003 contempt finding "was not a final judgment, because an essential element of the damages award remained unresolved, so that the contempt judgment [was] appealable." *Id.* at 485. This Court rejected that argument because "[t]he clear message of *Budinich* is to the contrary: even when a statute provides that attorney's fees are part of the damages claim, an award of compensatory damages effectively renders the decision final." *Id.* at 487. The Court thus held that "a decision awarding attorney's fees is not part of the merits for purposes of determining if the lower court issued a 'final decision,'" and accordingly dismissed the

appeals of the November 2002 contempt order and of the August 2003 damages award. *Id.* at 487-88.

Budinich, Ray Haluch, and Gnesys make clear the Contempt Order was an immediately appealable "final decision" on the merits, especially because, as in *Gnesys*, it included compensatory damages separate from the eventual fee award. The Contempt Order therefore constituted a judgment, and, indeed, the District Court even issued a separate memorandum opinion, RE 122, signifying the decision's finality. *See* Fed. R. Civ. Proc. 54(a) (defining a "judgment" as "a decree and any order from which an appeal lies"). If Swade wanted to appeal the Contempt Order, both Rule 4(a) and 28 U.S.C. § 2107(a) obligated him to do so within thirty days of the order's issuance, *i.e.*, by May 7, 2017. *See Browder v. Dir., Dep't of Corr. of Ill.*, 434 U.S. 257, 264 (1978) ("[A] notice of appeal in a civil case must be filed within 30 days of entry of the judgment or order from which the appeal is taken."). His November 29, 2017, notice of appeal therefore was over six months late, even if the Contempt Order reserved judgment on Fender's fee petition until later.[14] Because "[a] timely notice of appeal is a mandatory and jurisdictional prerequisite which this court can neither waive nor extend," *Searcy v. City of Dayton*, 38 F.3d

---

[14] Swade's second purported appeal of the Contempt Order on February 20, 2018, was even more untimely.

282, 287 (6th Cir. 1994), appellate jurisdiction therefore does not exist over
Swade's challenges to the Contempt Order.

## B.   Swade Has Waived the Challenges to the Contempt Order in Sections III-V of his Brief

Beyond the absence of appellate jurisdiction over them, the Court need
not consider the arguments in Sections III-V in Swade's brief because Swade
has waived those arguments by failing to raise them before the District Court.
"The clear rule is that appellate courts do not consider issues not presented to
the district court." *Brown v. Marshall*, 704 F.2d 333, 334 (6th Cir. 1983).
Consequently, "an argument not raised before the district court is waived on
appeal to this Court." *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th
Cir. 2008). Here, Swade unquestionably failed to raise the arguments in
question below, and no exceptional circumstances warrant a departure from
this Court's general waiver rules. The Court therefore should not consider
those arguments, which, as explained below, are meritless in any event.

## C.   Arizona Law, and Not That of Tennessee, Governs the Parties' Contractual Relationship

Beyond the lack of appellate jurisdiction over, and Swade's waiver of,
the arguments in Sections III and V of his brief, the Court need not consider
those arguments because Swade has invoked the wrong governing law. The
Settlement Agreement provides, "any disputes arising from or relating to it or

its subject matter, or the provisions or subject matter of the Consent Judgment

… shall be governed by … the laws of the United States and the State of

Arizona." Settlement Agreement, RE 120, sealed document page 14 ¶ 18.

Despite this clear guidance, Sections III and V of Swade's brief fail to identify

any reasons under Arizona law why the District Court erred in interpreting the

Settlement Agreement; indeed, Swade's brief lacks any references to that law.

Swade therefore has failed to carry his burden as an appellant.

**D.    Swade's Challenges to the Contempt Order are Otherwise Meritless**

**1.    The District Court Properly Interpreted the Permanent Injunction**

Leaving aside their jurisdictional and procedural infirmities, the Court

should reject the arguments in Sections III, IV, VI, and VII of Swade's brief

because the District Court properly interpreted the Permanent Injunction.

Specifically, the District Court did not abuse its discretion in applying this

Court's Safe Distance Rule when interpreting the Permanent Injunction;

indeed, it would have abused its discretion had it *not* done so. Likewise, the

District Court properly rejected Swade's invitation to read the "in any way

similar to" standard in the Permanent Injunction and the Settlement Agreement

out of existence simply because those documents contain additional prohibitions.[15]

     With respect to the belated nature of that invitation, the District Court observed that "the time for making such an argument and for negotiating language [in the Consent Judgment] was before Swade signed the Agreement and violated the terms thereof." Contempt Memorandum, RE 122, PageID# 1923. That admonishment follows this Circuit's rule that an enjoined party should seek clarification of an injunction's terms prior to being charged with contempt:

> The defendants acted at their own risk by failing to seek the court's interpretation of the injunction if they had any good faith doubt as to its meaning or by failing to have it set aside or amended if they thought it was defective. Once the injunction was entered the defendants were bound to obey it.

*Polo Fashions, Inc. v. Stock Buyers Int'l, Inc.*, 760 F.2d 698, 700 (6th Cir. 1985).

---

[15] Swade's mistakenly asserts the District Court erroneously construed the Settlement Agreement and Permanent Injunction by applying the "in any way similar to" standard. Swade does not, and cannot, argue he did not violate that standard. The evidence and testimony at both hearings conclusively established the similarity of his headstocks to Fender's trademarked designs. *See, e.g.*, Transcript, RE 124, Page ID# 1992:12-13 (admissions by Swade's own expert of similarities); Fender Expert Report, RE 113-1. Moreover, the Settlement Agreement provides for the imposition of $25,000 in liquidated damages per violation of the agreement, Settlement Agreement, RE 120, sealed document page 10, and the District Court was within its discretion to impose $50,000 in sanctions based on Swade's use of the two closely similar headstocks he presented at the second hearing.

Swade's complaints rest not on "good faith doubt" but instead on a nonsensical interpretation of the Permanent Injunction. Although Swade repeatedly suggests the Permanent Injunction contains two prohibitions, both it and the Settlement Agreement actually contain several more. Specifically, both documents require Swade to "completely cease" using:

- all headstocks "in any way similar" to "the trademarks, … designs … or identifying characteristics of Fender";

- all headstocks "confusingly similar" to Fender's Marks;

- all headstocks "likely to dilute the distinctiveness of" Fender's Marks;

- any "copy, reproduction, colorable imitation, or simulation of" Fender's Marks; and

- any headstock not a "unique head stock design … neither identical to nor … creat[ing] a likelihood of confusion with any head stock design owned by Fender."

Permanent Injunction, ER 94, PageID# 1262-64 ¶¶ 2(b)-(e); Settlement Agreement, RE 120, sealed document at 6-8, ¶¶ 3(b)-(e).

Swade improbably claims throughout his brief the prohibition quoted in the first bullet point (taken from Paragraph 2.c of the Permanent Injunction) applies only to Fender's *verbal* trademarks and excludes *nonverbal* marks such as its headstocks. But Fender has registered its headstocks as trademarks, and

this Court previously has recognized that a similarly registered nonverbal design is properly treated a "trademark." *See Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc*., 679 F.3d 410, 417 (6th Cir. 2012). Fender's headstocks therefore fall within the scope of "trademarks" under the prohibition, even if they did not also qualify as "designs" and "identifying characteristics," which they clearly do.

Referencing the broader text of Paragraph 2.c, Swade also argues the "in any way similar to" clause cannot be separated from the "or likely to dilute the distinctiveness of" clause in the phrase "or in any way similar to or likely to dilute the distinctiveness of, the trademarks, service marks, or logos, designs, source designations, or identifying characteristics of Fender" because no "serial comma" separates the two. But "the conjunction 'or' … link[s] alternative options of equal weight." *United States v. Dela Cruz*, No. 17-mc-50236, 2017 WL 2262985, at *2 (E.D. Mich. May 23, 2017). As the Supreme Court has held, the use of "or" in documents "is almost always disjunctive, that is, the words it connects are to be given separate meanings." *Loughrin v. United States*, 134 S. Ct. 2384, 2390 (2014). The injunction's inclusion of the term "or" therefore does not mean the words "in any way similar to" immediately preceding it either do not exist or can safely be ignored in the manner Swade advocates.

35

Indeed, Swade himself acknowledges that "as an agreed order based on contractual agreement, all of the words and phrases in the Consent Decree [are] to be given effect, and [a] construction that render[s] any part of [an] agreement surplusage should be avoided." Appellants' Brief at 13-14. Swade is correct: The canons of construction disfavor surplusage of the sort he proposes. *See Leonardi v. Furman*, 316 P.2d 487, 490 (Ariz. 1957) ("This Court is without authority to reject … words as surplusage *even where the contract is ambiguous*." (emphasis added)); *Tucker v. Byler*, 558 P.2d 732, 735 (Ariz. Ct. App. 1976) ("[I]t is presumed that the parties intended to give the words employed their ordinary meaning and that the language used was placed in the contract for a specific purpose."). Consequently, neither Judge Crenshaw nor Judge Sharp erred when recognizing that "the phrase 'in any way similar to' was clearly a part of the parties' agreement and the Permanent Injunction." Reconsideration Order, RE 158, PageID# 2543. As the latter explained, "Swade has signed an agreement, incorporated into a permanent injunction, requiring him to cease using trademarked designs and identifying characteristics that are 'in any way similar to' Fender's. Swade is bound by those words." Contempt Memorandum, ER 122, PageID# 1923-24.

Moreover, Swade's proposed surplusage would be particularly inappropriate here. Ignoring its other prohibitions, Swade argues the injunction

reaches only uses of headstocks "confusingly similar" to Fender's Marks. But "[t]he phrase 'confusingly similar' is shorthand for saying that the concurrent use of conflicting marks will create a likelihood of confusion and hence infringement." 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:4 (4th ed.). Swade's reading of the Permanent Injunction therefore would require him only to avoid infringing Fender's Marks, precisely the same obligation imposed on him (and all other industry participants) by federal law even had Swade not agreed to the injunction's terms in the first place. *See* 15 U.S.C. §§ 1114(1), 1125(a). Swade therefore would escape exposure arising from his past infringement without incurring any new restraints on his future conduct.

Swade's argument also ignores this Circuit's "Safe Distance Rule." In the trademark context, that rule requires an enjoined infringer not just to avoid confusingly similar marks; instead, it must stay far away from the infringed mark:

> Equity allows courts, faced with recalcitrant parties who repeatedly violate the law, to craft permanent injunctions which proscribe activities that, standing alone, would have been unassailable. This equitable principle goes by a specialized name in the context of permanent injunctions to protect intellectual property—the Safe Distance Rule. Like the general principle, the Safe Distance Rule prevents known infringers from using trademarks whose use by non-infringers would not necessarily be actionable.
> The Safe Distance Rule gives courts a particularly useful tool in crafting and enforcing permanent injunctions. Once a party infringes

on another's trademark or trade dress, the confusion sowed is not magically remedied by *de minimis* fixes. Instead, the confusion lingers, creating the need for the infringer not only to secure a new non-infringing name (or other infringing characteristic) for his product, but *one so far removed from any characteristic of the plaintiff so as to put the public on notice that the two are not related*. In contempt proceedings, the Safe Distance Rule relieves the reviewing court of the need to retry the entire range of issues that may be relevant in an infringement action for each small variation the defendant makes to the enjoined mark. If the law were otherwise, an enjoined party could simply make a tiny change and start a new trademark contest all over again in the context of the contempt hearing as to use of the "new" format.

*Innovation Ventures, LLC v. N2G Distrib., Inc.*, 763 F.3d 524, 544 (6th Cir. 2014) (alterations accepted) (emphasis added) (citations omitted). Having made inadequate changes to their packaging following a finding of infringement, the defendants in *Innovation Ventures*, like Swade here, claimed entitlement to a new full-blown likelihood-of-confusion analysis on the plaintiff's contempt motion. This Court held otherwise: "The issue was not whether anyone infringed Plaintiff's protected marks, but whether Defendants and their agents had violated the permanent injunction." *Id*. at 546.

Swade's attempt to distinguish the Safe Distance Rule reflects a similar error. Page 37 of Swade's brief asserts the District Court erred by applying the rule without finding him a "repeat infringer," but infringement no longer was the issue once Swade agreed to a Permanent Injunction barring him from using headstocks "in any way similar to" Fender's Marks: To the contrary, as Judge

Sharp aptly noted, "it's not about [confusing similarity or infringement] anymore. That ship has sailed." Transcript, ER 124, PageID# 1962:2-8.

### 2.    Neither the Permanent Injunction nor the Settlement Agreement Unlawfully Restrains Trade

Beyond the absence of appellate jurisdiction over it, Swade's waiver of it, his failure to recognize that Arizona law governs the parties' relationship, and his failure to document his alleged damage,[16] the restraint-of-trade argument in Section V of Swade's brief is meritless on multiple levels: (1) the protection of trademark rights through settlement agreements promotes, rather than restrains, trade and the public interest; (2) the record confirms the availability to Swade of numerous headstock designs in no way similar to Fender's Marks; and (3) Swade's proffered case law is neither apposite nor controlling.[17]

As to the first proposition, settlements of trademark actions do not unlawfully restrain trade: "Agreements that restrict a competitor's ability to use

---

[16] The record lacks any such documentation because, despite not moving to stay the Contempt Order pending appeal, Swade continues to use the headstock designs the District Court found to be in violation of the Injunction. Attorneys' Fees Motion Declaration, ER 126-1, 126-5, 126-6, Page ID# 2062, 2091-2104. Any damage he may claim therefore is entirely speculative.

[17] This includes *John B. v. Emkes*, 710 F.3d 394 (6th Cir. 2013), and *Horne v. Flores*, 557 U.S. 433 (2009), cited on page 31 of Swade's brief for the proposition that consent decrees must be reasonable and protect the public. Both arose from Rule 60(b)(5) motions to abrogate consent agreements, relief not sought by Swade before the District Court.

a particular mark cannot have any meaningful exclusionary or anticompetitive effect because the competitor remains free to sell its goods using a different mark." *adidas Am., Inc. v. Payless Shoesource, Inc.*, 529 F. Supp. 2d 1215, 1263 (D. Or. 2007); *see also Cal. Packing Corp. v. Sun–Maid Raisin Growers*, 165 F. Supp. 245, 251 (S.D. Cal. 1958) (dismissing similar argument using identical rationale), *aff'd*, 273 F.2d 282 (9th Cir. 1959). Agreements such as the one here therefore *promote* rather than *restrain*, trade:

> [T]rademark agreements are favored in the law as a means by which parties agree to market products in a way that reduces the likelihood of consumer confusion and avoids time-consuming litigation…. At the time of the execution of such an agreement, the parties are in the best position to determine what protections are needed and how to resolve disputes concerning earlier trademark agreements between themselves. While the intent of the parties may not always be determinative, it is usually unwise for courts to second-guess such decisions. In the absence of evidence to the contrary it is reasonable to presume that such arms-length agreements are pro-competitive.

*Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 57 (2d Cir. 1997).[18]

---

[18] These outcomes reflect judicial recognition that "trademarks desirably promote competition," *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 193 (1985), and that individual trademarks do not constitute markets. *See United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 393 (1956) ("[The] power that … automobile or soft-drink manufacturers have over their trademarked products is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the competitive market for the product."). Swade's argument ultimately depends on the proposition that "every manufacturer of a trademarked product has monopoly power over that product. No legal precept stands for this proposition." *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 117 (3d Cir. 1980).

Consistent with these holdings, nothing in the Permanent Injunction or Settlement Agreement prevents Swade from practicing his trade in direct competition with Fender. Indeed, Swade does not argue otherwise; rather, he challenges only the prohibition on headstocks "in any way similar to" those of Fender. As the testimony and report of Fender's expert witness demonstrates, however, numerous other guitar manufacturers compete with Fender just fine using headstock designs *not* "in any way similar to" those of Fender. Those alternative designs include the following:





Fender Expert Declaration, ER 113-1, 1706-1714 ¶¶ 13-32. Swade fails to explain his putative inability to develop a headstock design unique to his own goods as these other competitors to Fender have.

Lacking direct support, Swade resorts to opinions arising from the employer-employee context and having nothing to do with trademark rights. Even if considered, however, case law addressing employment-related contracts do not advance Swade's position. For example, in *Henderson v. Jacobs*, 239 P.2d 1082, 1086 (Ariz. 1952), the Supreme Court of Arizona sustained the validity of an employment-related contract because it "did not prohibit [the defendant] from engaging in all types of work whatsoever." *Id.* at 1086. Similarly, in *Bed Mart, Inc. v. Kelley*, 45 P.3d 1219 (Ariz. Ct. App. 2002), the Arizona Court of Appeals rejected an attack on another agreement after determining it "did not prohibit [the plaintiff's former employee] from working in his chosen employment." *Id.* at 1222. Indeed, because the prohibition at issue allows Swade to ply his trade as a luthier, it is not a covenant not to compete under Arizona law in the first place. *See Alpha Tax Servs. v. Stuart*, 761 P.2d 1073, 1075 (Ariz. Ct. App. 1988).

The four opinions cited on pages 32-36 of Swade's brief would not assist him even if they applied Arizona law. The contracts at issue in three completely prohibited exercise of the defendants' trades in competition with

the plaintiffs. *See NuMarkets, LLC v. Boyd*, No. 1:04 CR 356, 2004 WL 3327267, at *1 (E.D. Tenn. Dec. 10, 2004) (agreement barring participation in "any similar competing business"); *Hasty v. Rent-A-Driver, Inc*., 671 S.W.2d 471, 472 (Tenn. 1984) (agreement barring competition in any city occupied by former employer); *Allright Auto Parks, Inc. v. Berry*, 409 S.W.2d 361, 365 (Tenn. 1966) (agreement barring competition in any city occupied by plaintiff). And the fourth, *Koehler v. Cummings*, 380 F. Supp. 1294 (M.D. Tenn. 1971), *rejected* the challenge to the contract at issue under Tennessee law because the contracting party "was not deprived of his only opportunity of employment." *Id.* at 1307. The same is true here and Swade's argument therefore without merit.

### 3.    The Contempt Finding Did Not Violate Swade's Constitutional Rights

"[C]ivil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994). Here, Swade received both multiple notices and opportunities to be heard.

Swade's suggestion Fender communicated an intent to pursue a contempt finding only as to Paragraph 2.e of the Permanent Injunction, *i.e.*, the

44

restriction on use of confusingly similar and identical headstocks, is meritless.[19] As set forth in greater detail in Section I.D, Fender and the District Court both repeatedly advised Swade that Fender's motion additionally sought relief based on Swade's violation of Paragraph 2.c's "in any way similar to" prohibitory language. Fender's moving papers even italicized and put into bold type references to that language to call attention to it. *See* Contempt Motion, RE 96-1, PageID# 1281; Supplemental Contempt Brief, RE 115, sealed document at 2, 3, 5; *see also Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 151 (2d Cir. 2000) ("[T]he note ... is highlighted in italics, suggesting that it warrants special attention and consideration."). The District Court therefore rightly found Swade's failure to address that standard was "created by Swade and his counsel alone." Reconsideration Order, RE 158, PageID# 2542-2543.

Swade also had numerous chances to be heard on Fender's motion: (1) he filed a responsive brief; (2) the District Court granted his request to submit expert witness testimony over Fender's objections;[20] and (3) his two lawyers appeared at two lengthy hearings, at the second of which his lead counsel (a) presented expert testimony, (b) cross-examined Fender's expert

---

[19] The absence of a supporting record citation makes determining the basis of this suggestion difficult.

[20] Swade's expert acknowledged his failure to address whether the parties' guitar headstocks were "in any way similar." *See* Transcript, ER 124, at 1995:3-1996:14.

witness, and (c) could have had Swade himself testify. The District Court therefore did not abuse its discretion in determining that "[b]oth Fender's and Swade's counsel were given opportunities to argue their positions before the Order of Contempt was entered, and there was no deprivation of Swade's due process rights in that regard." Reconsideration Order, RE 158, PageID# 2543.[21]

## III.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING SWADE RELIEF UNDER RULE 60(b)

The Contempt Order issued on April 4, 2017, yet Swade waited until September 16, 2017, and November 24, 2017, before challenging it. Indeed, only after the Court's August 18, 2018, Attorneys' Fee Order, ER 135, exposed Swade to a fee award, did Swade move for reconsideration. Reconsideration Motion, ER 139.[22] Apparently recognizing that motion's untimeliness, Swade filed a second one seeking a "new trial." New Trial Motion, ER 145. Both motions argued the Contempt Order *erred* by applying the "in any way similar

---

[21] Swade's primary proffered opinion, *North American Coal Corp. v. United Mine Workers of America*, 512 F.2d 238 (6th Cir. 1975), is inapposite. There, this court reversed the holding of 700 miners in criminal contempt because they: (1) did not receive notice of the injunction, a contempt citation, or a description of the alleged contempt; (2) were not present at the contempt hearing; and (3) were erroneously charged with proving their innocence. In contrast, Swade knew of the injunction, received a copy of Fender's papers months before filing, attended both hearings, and benefitted from Fender's burden to prove contempt based on "clear and convincing evidence." Contempt Memorandum, ER 22, Page ID# 1921.

[22] The August 18, 2018, order granted Fender's request subject only to a reduction in its counsel's hourly rates. Attorneys' Fees Order, ER 158.

to" standard to Swade's conduct. Reconsideration Motion, ER 139, PageID# 2314-2328; New Trial Motion, ER 145, PageID# 2434-35, 2438, 2444-2455. Moreover, each motion asserted the conclusory contention that the facts supporting relief under Rules 54(b) and Rule 59 likewise supported relief under Rule 60(b). *See* Reconsideration Motion, ER 139, PageID# 2329; New Trial Motion, ER 145, PageID# 2456.[23]

Despite asserting Rule 60(b) as an afterthought below, Swade's attacks on the Contempt Order now rest primarily on that Rule. Swade claims entitlement to relief under it because: (1) he suffered "surprise" at the hearings based on Fender's and the District Court's focus on the "in any way similar to" standard; (2) his attorney erred by failing to address that standard; and (3) Fender's counsel made a "misrepresentation" by urging application of the standard. Swade's arguments are both time-barred and unfounded.

## A.    Swade's Rule 60(b) Arguments Were Untimely

Under Rule 60(c), a "motion under Rule 60(b) must be made within a reasonable time—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding." Here, the District Court properly exercised its discretion to deny Swade's motions as untimely

---

[23] Only in a reply brief did Swade first claim entitlement to relief under Rule 60(b). Reconsideration Motion Reply, ER 153, Page ID# 2498-2500. That brief also requested relief under Rule 60(b)(1) and (6) based on "judicial misconduct." *Id.*

for two reasons: (1) because Swade's motions assert alleged legal errors, they were due before the appeal deadline; and (2) they were unreasonably late even if not asserting alleged legal errors.

As to the first of these infirmities, this Court has recognized that Rule 60(b) movants asserting errors of law must act within the normal time for taking an appeal. *See Pierce v. United Mine Workers of Am. Welfare & Ret. Fund for 1950 & 1974*, 770 F.2d 449, 451 (6th Cir. 1985) ("A 60(b)(1) motion based on legal error must be brought within the normal time for taking an appeal."). Here, Swade's motions make clear he is simply arguing legal error. Although claiming "surprise" and "misrepresentation," he simply repackages his contention that the Contempt Order erroneously applied the wrong standard. Indeed, Swade's first reconsideration motion argued the District Court "did not apply the prevailing standard for analysis" and thus it should "correct an error of law" under Rule 54. Reconsideration Motion, ER 139-1, PageID# 2329. Swade immediately thereafter argued, "Rule 60, by analogy and *parallel of reasoning*, provides support for the granting of the motion." *Id.*, PageID# 2328-29 (emphasis added). Similarly, after arguing for a "new trial" based on a "clear error of law," Swade's "motion for new trial" explained, "Rule 60, by analogy and a *parallel of reasoning*, provides further support for the granting of the motion." New Trial Motion, 145-1, PageID# 2455

(emphasis added). Both requests for relief under Rule 60(b) thus presupposed an alleged legal error in the Contempt Order. *See also* Appellants' Brief at 46 (arguing the Reconsideration Order "explicitly utilized the consent decree ... as one of the basis [sic] for finding that there was not 'surprise' or that such was unreasonable, *it made the same error as did the trial court previously (Judge Sharp sitting) in connection with the contempt hearing*, by violating the cannons of construction." (emphasis added)). Swade cannot circumvent his failure to appeal the alleged legal error in the Contempt Order by repackaging his arguments under Rule 60(b). *See Hopper v. Euclid Manor Nursing Home, Inc.*, 867 F.2d 291, 294 (6th Cir. 1989) ("The parties may not use a Rule 60(b) motion as a substitute for an appeal."). With Swade having failed to bring his motions before the appeal deadline, the District Court properly denied the motions as untimely. *Pierce*, 770 F.2d at 451.

Moreover, even in the absence of that rule, the District Court did not otherwise abuse its discretion in finding the motions—filed over five months and seven months after the Contempt Order—untimely. *See* Reconsideration Order, ER 158, PageID# 2542 ("To the extent Swade's motions are filed seeking relief from the Court's Contempt Order pursuant to Fed. R. Civ. P. 60, such a motion had to be filed 'within a reasonable time,' and this one was not."). Even if "surprised" by the application of the "in any way similar to"

standard at the hearings, Swade fails to explain his failure to correct the
District Court at or shortly after either hearing. Nor does he explain his
lethargy in challenging the Contempt Order before the District Court. His
months-long delay before taking action therefore is indefensible. *Deran Mktg.
Corp. v. Fisher Foods, Inc.*, 787 F.2d 589 (6th Cir. 1986) ("[A] motion under
Rule 60(b)(1) will be held untimely if not brought within a reasonable time,
even though brought within one year."); *cf. Days Inn Worldwide, Inc. v. Patel*,
445 F.3d 899, 906 (6th Cir. 2006) (affirming denial of Rule 60(b)(4) motion in
absence of "any good reason" for delay in filing motion or explanation for
failure to notice timely appeal).

### B.   In Denying Relief Under Rule 60(b)(1), the District Court Correctly Determined Any "Surprise" Was Unreasonable

The District Court did not abuse its discretion in rejecting Swade's Rule
60(b)(1) arguments as meritless even if timely filed. Fender clearly placed
Swade on notice prior to the first hearing of its reliance on the "in any way
similar to" standard through pre-filing correspondence and its opening and
reply briefs. Even if Swade's failure to heed those warnings was excusable—
and it is not—Swade and his counsel ignored a flood of additional warnings
prior to the second hearing, including those delivered by Judge Sharp in open
court at the first hearing, as well as those found in Fender's supplemental brief
and expert witness report. And, as they did before the District Court, Swade's

arguments before this Court fail to answer the question of why, having

allegedly suffered surprise at the first hearing, Swade's counsel attended the

second hearing yet again unprepared to argue the "in any way similar to"

standard and accompanied by an equally unprepared expert witness wholly

unfamiliar with that standard. If Swade's alleged surprise at the first hearing

was unreasonable, his alleged surprise *at the very same issue* less than a month

later was even more so. Based on the indisputable evidence that any surprise

was "created by Swade and his counsel alone," Reconsideration Order, ER

158, PageID# 2543, and therefore inexcusable, the District Court correctly

refused relief under Rule 60(b)(1).

### C. Swade's Failure to Present Relevant Evidence and Argument at Both Hearings Does Not Support Rule 60 Relief

In support of Swade's first motion for reconsideration, his counsel

admitted to "excusable neglect," and suggested:

> Just as relief can be granted to remedy prejudice suffered due to surprise, this Court may also grant relief to remedy excusable neglect, and however my response to the situation be characterized, I request the Court to remedy it, so that the consequences of my surprise and/or excusable neglect should not be unfairly visited upon Mr. Swade.

Reconsideration Motion Declaration, RE 139-3, PageID #2336 at ¶ 7. Despite

this candor, Swade failed to raise or brief "excusable neglect" as part of his

Rule 60 motion and therefore waived it on appeal. *See United States v. Universal Mgmt. Servs.*, 191 F.3d 750, 759 (6th Cir. 1999).

Nevertheless, apparently referring to the finding that Swade's loss below was his own fault and that of his counsel, Swade claims entitlement to relief under Rule 60(b) based on "attorney error."[24] Appellants' Brief at 50. Because "clients must be held accountable for the acts and omissions of their chosen counsel," *United States v. Reyes*, 307 F.3d 451, 456 (6th Cir. 2002), he is not so entitled.

Specifically, even if Swade's belated claim is considered, his attorney's error provides no basis for relief under Rule 60. Both opinions cited by Swade for the contrary proposition, *Tanner v. Yukins*, 776 F.3d 434 (6th Cir. 2015), and *Lewis v. Alexander*, 987 F.2d 392, 396 (6th Cir. 1993), involved missed deadlines for reasons beyond the appellants' control. In *Tanner*, a pro se prisoner missed the deadline to appeal the denial of her habeas petition by one day because prison guards denied her access to the prison library. 776 F.3d at 435-36. This Court reversed the denial of the prisoner's Rule 60(b)(1) motion, holding the prisoner's "extraordinary circumstance … should have been obvious." *Id.* at 443.

---

[24] As before the District Court, Swade does not identify the provision of Rule 60(b) allegedly providing relief.

52

*Lewis* also involved a missed appeal deadline, but there the appellant sought relief under Rule 60(b)(1) based on "mistake." As this Court explained in finding no abuse in the lower court's grant of relief under Rule 60, the attorney "acted diligently in attempting to comply with the time constraints for filing the notice of appeal" and "forwarded the notice of appeal to the court in a timely manner, but for reasons attributable to either the Clerk's Office or the postal service, the Clerk's Office did not docket the appeal within the time required by Rule 4." *Lewis*, 987 F.2d at 397.

No similar circumstances beyond Swade's control exist here. Instead, without any proffered excuse, his counsel erred by arguing only the "confusingly similar to" language of the Settlement Agreement and Permanent Injunction, despite repeated notices from Fender and the District Court of the impending application of the "in any way similar to" standard. Having failed timely to appeal the Contempt Order, Swade may not now "use a Rule 60(b) motion as a substitute for an appeal …, or as a technique to avoid the consequences of decisions deliberately made yet later revealed to be unwise." *Hopper v. Euclid Manor Nursing Home, Inc.*, 867 F.2d 291, 294 (6th Cir. 1989).

### D.    Fender's Counsel Properly Invoked the Terms of the Permanent Injunction and Settlement Agreement

The District Court properly exercised its discretion to reject Swade's claim of attorney "misconduct" under Rule 60(b)(3). Specifically, Swade failed to prove by the necessary clear and convincing evidence "a deliberate act that adversely impacted the fairness of the relevant legal proceeding [in] question." *Travelers Cas. & Sur. Co. of Am. v. J.O.A. Constr. Co.*, 479 F. App'x 684, 693 (6th Cir. 2012); *see also Jordan v. Paccar, Inc.*, No. 95-3478, 1996 WL 528950, at *9 (6th Cir. Sept. 17, 1996) (requiring clear and convincing evidence).

First, Fender's attorney simply argued a standard memorialized in the Permanent Injunction *and* in the Settlement Agreement—documents to which Swade agreed and certified he understood. Permanent Injunction, ER 94, PageID# 1266; Settlement Agreement, ER 120, sealed document page 13. Even had that argument not been in plain view, advocating the application of an express provision from two agreed-upon documents neither constitutes misconduct nor prejudices Swade.

Second, Swade suffered unfairness neither at the hearings nor in the Contempt Order. Fender provided Swade with ample notice of its reliance on the "in any way similar to" standard. And the Court ruled only after full briefing and two hearings, at the second of which Swade presented argument

54

and expert testimony, cross-examined Fender's expert, and could have testified himself. Finally, Swade was not prejudiced for, as the District Court found after reviewing its alleged error, "[t]he Court was not misled … because the phrase 'in any way similar to' was clearly a part of the parties' agreement and the Permanent Injunction." Reconsideration Order, ER 158, PageID# 2540-43. Relief under Rule 60(b)(3) therefore did not lie; indeed, if any misconduct exists, it lies in Swade's disregard of the appeal deadline, citation to defunct authority, and refusal to acknowledge the "in any way similar to" standard.

## IV.    THE DISTRICT COURT PROPERLY AWARDED FENDER'S FEES AND COSTS

As Judge Crenshaw recognized, Attorneys' Fees Order, ER 135, PageID# 2282, both the Permanent Injunction and the Settlement Agreement contain fee-shifting provisions triggered by a successful enforcement action. The District Court's fee award is correct under Arizona and Circuit law, and the District Court therefore did not abuse its discretion.

In *Sirrah Enterprises v. Wunderlich*, 399 P.3d 89 (Ariz. 2017), the Arizona Supreme Court interpreted a similar provision reading, "the prevailing party *shall* be entitled to and the losing party shall pay all expenses and costs including reasonable attorney's fees incurred by the prevailing party." *Id.* at 91 (emphasis added). Following a successful enforcement action, the court affirmed a fee award because "[t]he parties' contract requires a fee award to the

55

successful party on a claim 'to enforce any term or provision....' As the successful party in the claim to enforce the [contract], the [plaintiffs] were entitled to their reasonable attorney fees." *Id.* at 94.

The Settlement Agreement's use of "shall" similarly mandates a fee award here. *See Chase Bank of Ariz. v. Acosta*, 880 P.2d 1109, 1121 (Ariz. Ct. App. 1994) ("A contractual provision for attorneys' fees will be enforced according to its terms…. [T]he court lacks discretion to refuse to award fees under [such a] contractual provision."), *petition for review denied*, 890 P.2d 1152 (Ariz. 1995). Moreover, this result would hold even if Arizona law did not control. *See Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 722 (6th Cir. 1996) (affirming, in appeal from contempt proceeding, fee award made under similar fee-shifting provision of settlement agreement).

The Permanent Injunction's fee-shifting language provides a separate basis for a fee award. "Courts have inherent authority to enforce their judicial orders and decrees in cases of civil contempt by assessing attorneys' fees." *Liberis v. Craig*, 845 F.2d 326 (Table), 1988 WL 37450, at *5 (6th Cir. Apr. 25, 1988); *Redken Labs. v. Levin*, 843 F.2d 226, 230 (6th Cir. 1988) (affirming sanction of fees and costs for violation of injunction). This is particularly true if that sanction is agreed-upon. *Rolex Watch*, 74 F.3d at 722. The District Court's action therefore was routine and unremarkable. *See, e.g., Chambers v.*

*NASCO, Inc.*, 501 U.S. 32, 45 (1991) ("[A] court may assess attorney's fees as a sanction for the willful disobedience of a court order."); *accord Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718 (1967); *Redken Labs.*, 843 F.2d at 229.

Swade neither argues otherwise nor explains why this Court should disturb the fee award. Indeed, Swade dedicates only two paragraphs to the issue, one of which merely repeats his attacks on the Contempt Order and is therefore irrelevant. Unaccompanied by supporting authority, the other paragraph asserts Fender "demanded a very large amount of fees for handling two one-afternoon hearings," noting federal public defenders charge only $1,000 for a hearing. Appellants' Brief at 37. Swade then argues Fender's attorneys improperly charged for time traveling to the hearings. Neither argument establishes an abuse of discretion.[25]

First, the fee award did not merely compensate Fender for two hearings but reflected reasonable time spent by its attorneys: (1) negotiating for a pre-filing resolution; (2) discussing enforcement strategy; (3) preparing its motion, three supporting briefs, two supporting declarations, and numerous exhibits; (4) preparing for and attending two lengthy hearings; and (5) consulting with

---

[25] Swade does not otherwise challenge other aspects of the fee order and therefore has waived his right to appeal them.

the expert required by the District Court (at Swade's request). Attorneys' Fee Memorandum, ER 126, PageID# 2040-2041 (citing declarations PageID# 2058-2119). Based on Fender's evidence, the District Court properly exercised its discretion in awarding fees expended in obtaining the Contempt Order, regardless of Swade's unsubstantiated statements as to rates charged by public defenders.[26]

The District Court also did not err in approving the travel costs of Fender's attorneys to attend the District Court's hearings. Such awards are within the trial court's discretion based on its familiarity with local practice. *Perotti v. Seiter*, 935 F.2d 761, 764 (6th Cir. 1991). The District Court's award of these fees thus does not justify reversal.

---

[26] Contrary to Swade's characterization of them, the District Court held that the results obtained by Fender were "clearly not 'modest'" because Fender proved both Swade's violations and its entitlement to sanctions. Attorneys' Fee Order, ER 122, PageID# 1926.

## V.    CONCLUSION

This Court should dismiss Swade's challenges to the Contempt Order for

want of appellate jurisdiction; it otherwise should affirm the District Court in

all respects.

 */s/ Theodore H. Davis, Jr.*
Theodore H. Davis Jr.
Crystal C. Genteman
Kilpatrick, Townsend & Stockton LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4528
Telephone: (404) 815-6500

Counsel for Plaintiff-Appellee Fender
Musical Instruments Corporation

## CERTIFICATE OF COMPLIANCE

This brief complies with the word count limitation of Fed. Cir. R. 32(a)(7)(B), and contains 13,000 words, exclusive of the portions exempted by Fed. R. App. P. 32(f).

The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in 14-point Times New Roman type.

 */s/ Theodore H. Davis, Jr.*
Theodore H. Davis Jr.


## CERTIFICATE OF SERVICE

The undersigned certifies that on June 27, 2018, an electronic copy of Appellee's Brief was filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. The undersigned also certifies that all participants are registered CM/ECF users and will be served via the CM/ECF system.


 */s/ Theodore H. Davis, Jr.*
Theodore H. Davis Jr.

## DESIGNATION OF RELEVANT COURT DOCUMENTS

| Document | Date Filed in District Court | Docket # | Page ID# |
|---|---|---|---|
| Complaint | 02/28/2013 | 1 | NA |
| Joint Motion for Entry of Final Judgment | 10/13/2014 | 91 | 1228-1243 |
| Order Scheduling Telephone Conference | 10/30/2014 | 92 | 1244 |
| Renewed Joint Motion for Entry of Final Judgment and Permanent Injunction on Consent | 11/11/2014 | 93 | 1245-1257 |
| Final Judgment and Permanent Injunction | 10/03/2016 | 94 | 1625-1631 |
| Certificate of Compliance | 02/19/15 | 95 | 1269-1270 |
| Brief in Support of Plaintiffs' Motion to Reopen case, to hold Defendants in Contempt, and for Sanctions | 08/24/2016 | 96-1 | 1276-1299 |
| Exhibit C to Declaration of Mark Van Vleet | 08/24/2016 | 96-5 | 1332-1364 |
| Defendants' Opposition to Plaintiffs' Motion for Contempt | 09/16/2016 | 99 | 1540-1566 |
| Plaintiffs' Reply Brief in support of Motion to Reopen case, to hold Defendants in Contempt, and for Sanctions | 10/03/2016 | 104 | 1625-1631 |
| Notice of Filing exhibits | 09/21/2016 | 110 | 1567-1570 |
| Rebuttal Expert Report of Bruno Pirecki | 03/02/2017 | 113-1 | 1701-1725 |
| Declaration of Mike Lewis (06/05/2014) | 03/02/2017 | 113-2 | 1727-1771 |
| Declaration of Mike Lewis (09/18/2014) | 03/02/2017 | 113-3 | 1773-1830 |
| Plaintiffs' Supplemental Memorandum in support of Motion to Reopen Case, to | 03/02/2017 | 115 | Sealed document |

| Document | Date Filed in District Court | Docket # | Page ID# |
|---|---|---|---|
| hold Defendants in Contempt, and for Sanctions | | | |
| Settlement Agreement | 03/02/2017 | 120 | Sealed document |
| Contempt Opinion | 04/07/2017 | 122 | 1918-1927 |
| Contempt Order | 04/07/2017 | 123 | 1928-1929 |
| March 3, 2017 Hearing Transcript | 04/18/2014 | 124 | 1930-2034 |
| Plaintiffs' Memorandum in Support of Motion for Attorneys' Fees | 05/08/2017 | 126-1 | 2036-2057 |
| Declaration of Theodore H. Davis in Support of Attorneys' Fees Motion, Exhibit 4 | 05/08/2017 | 126-5 | 2091-2092 |
| Declaration of Theodore H. Davis in Support of Attorneys' Fees Motion, Exhibit 5 | 05/08/2017 | 126-6 | 2093-2104 |
| Plaintiffs' Reply in support of Motion for Attorneys' Fees and Costs | 07/17/2017 | 134 | 2270-2280 |
| Attorneys' Fees Order | 08/18/2017 | 135 | 2281-2288 |
| Declaration of Charles Carreon in support of Motion for Reconsideration of Contempt Order | 09/16/2017 | 139-3 | 2334-2338 |
| Attorneys' Fee Order | 10/30/2017 | 143 | 2352 |
| Plaintiffs' Sur-Reply in Opposition to Defendants' Motions for Reconsideration and New Trial | 01/12/2018 | 156 | 2509-2526 |
| Defendants' Objections to Plaintiffs' Sur-reply in Opposition to Defendants' Motion for Reconsideration | 01/19/2018 | 157 | 2527-2538 |
| Reconsideration Order | 02/05/2018 | 158 | 2539-2543 |